RANDY S. GROSSMAN
United States Attorney
STEPHEN H. WONG
Assistant U.S. Attorney
California Bar No. 212485
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-9464

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 14-CR-1288-DMS |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| RANDY ALTON GRAVES (1), | Date:  July 29, 2022 |
| Defendant. | Time: 1:30 p.m. |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Stephen H. Wong, Assistant United States Attorney, and hereby files its sentencing memorandum as to defendant Randy Graves (GRAVES).  This memorandum and response is based upon the files and records of the case.

## I

## INTRODUCTION

Defendant Randy Alton GRAVES is a serial drug dealer, a convicted killer [PSR ¶ 112], a convicted rapist [PSR ¶ 113], a pimp [PSR ¶¶ 13, 118, 120], and a leader of the ultra-violent West Coast Crips street gang.  The PSR documents a crime spree that

began in 1976 when GRAVES was 13 years old, and includes thirteen separate adult criminal convictions, seven of which were felonies, two of which were violent crimes, and four of which were drug crimes. GRAVES boasts that over his 35-year career as a gang member he has killed five or six people and is therefore to be respected. [PSR ¶ 53]. GRAVES murderous streak continued up through his arrest in this case. Relevant conduct revealed during this investigation provides clear and convincing evidence that GRAVES counselled the murder of Paris Hill by co-defendant Terry HOLLINS, and that GRAVES also counselled co-defendants Donald BANDY and Jermain COOK to murder and silence witnesses to Hill's death.

The Court can now end GRAVES' forty-year crime spree. The sentencing guidelines advise a range of 360 months to life. Based on the multiple drug crimes for which GRAVES was convicted, his obstruction at trial, his life-long criminal history, and the other crimes he committed through the course of this investigation (upon a finding based on clear and convincing evidence of that relevant conduct), the Court should exercise its discretion to impose a sentence at the high end of that range: life in prison.

## II

## BACKGROUND FACTS AND GUIDELINE CALCULATIONS

On March 28, 2016, a jury convicted GRAVES of conspiracy to distribute methamphetamine (Count 1), conspiracy to distribute marijuana (Count 2), and possession with intent to distribute methamphetamine (Count 3).[1]   The evidence

---

[1]   On December 18, 2015, the Grand Jury returned a fifth superseding indictment, charging GRAVES and others with, among other crimes, conspiracy to distribute methamphetamine (count 4), conspiracy to distribute marijuana (count 5), and possession with intent to distribute methamphetamine (count 10). For purposes of GRAVES' jury trial, the Court and the parties referred to Counts 4, 5, and 10, as Counts 1, 2, and 3, respectively. To be consistent, the same numbering will be used in this sentencing memorandum.

presented at trial left no doubt that GRAVES was a prolific drug dealer. As to Counts 1 and 3, the jury found that the amount of actual methamphetamine involved in these offenses weighed 50 grams or more.  As to Count 2, the jury found that the amount of marijuana weighed 1,000 kilograms or more.

As a result of his conviction and the information filed under 21 U.S.C. § 851 (alleging two prior drug felony convictions), GRAVES faced a mandatory sentence of life in prison. On August 4, 2016, the Court imposed a life sentence. ECF No. 1258. In imposing sentence, the Court applied the following sentencing guidelines:

| | |
|---|---|
| Base Offense Level U.S.S.G. § 2D1.1(c)(4), cmt. [n.8(b) ] 6,476 CDW | 32 |
| Specific Offense Characteristics: | |
| Possession of a firearm U.S.S.G. § 2D 1.1(b)(1) | +2 |
| Leader/Organizer Role U.S.S.G. § 3B1.1(a) | +4 |
| Obstruction of Justice U.S.S.G. § 3C1.1 | +2 |
| Criminal History Score: | 12 |
| Criminal History Category | V |

Reporter's Transcript July 26, 2016 (Tr.) at 138-39. The Court found the guideline range to be 360 months to life, with a mandatory minimum sentence of life, which became the guideline range. Tr. at 139. The Court further assessed relevant conduct to GRAVES based on his involvement in the murder of Paris Hill, sex trafficking of co-defendant Solcamire Castro-Hernandez, other drug sales, and firearms trafficking. Tr. at 140. As to GRAVES history and characteristics, the Court found that GRAVES is a "recidivist criminal" with "no history of gainful employment for many, many years" and led a life dedicated to "criminal activity, gang activity, and violence." Tr. at 140-41. The Court also cited life sentences imposed in the related case. Tr. at 142. Based on the guidelines, the mandatory minimum sentence, GRAVES's relevant conduct, GRAVES's history and characteristics, and the life sentences imposed in the related RICO case, the Court imposed a life sentence. Tr. at 142.

On appeal, GRAVES challenged one of the two predicate offenses alleged in the information filed pursuant to 21 U.S.C. § 851 to qualify GRAVES for a mandatory life sentence. Specifically, GRAVES challenged whether California Penal Code § 4573.6,[2] qualified as a "felony drug offense." The Ninth Circuit found that the statute does not qualify, because it is categorically overbroad and is not divisible. *United States v. Graves*, 925 F.3d. 1036, 1039 (2019). Thus, GRAVES's conviction for violating Cal. P.C. § 4573.6 did not trigger a mandatory life sentence. The Ninth Circuit further noted that even though the Court stated it would have imposed a life sentence even without the mandatory minimum sentence pursuant to 18 U.S.C. § 3553(a), it would still remand the case for re-sentencing to give GRAVES the opportunity to submit to a presentence interview and file a sentencing memorandum. *Graves*, 925 F.3d. at 1041.

### III

### DISCUSSION

**A.    Guideline Calculations**

The Government agrees with the presentence report's (PSR) calculation of an adjusted offense level 40, a Criminal History Category of V, and a guideline range of 360 months to life imprisonment as to each of the three counts.

For the reasons discussed below, the Government disagrees with the Probation Officer's recommendation of 360 months, the low end of the guidelines, to be served concurrently, as to each count of conviction. A high-end sentence of life is required.

**1.  Special Rule on Resentencing**

When a defendant's guideline range was restricted by a mandatory minimum sentence, and the court is re-sentencing a defendant where the mandatory minimum sentence no longer applies, the guidelines instruct the Court to re-determine the defendant's guideline range without regard to the previous mandatory minimum sentence. U.S.S.G. § 5G1.2 Application note 2(D).

---

[2] Prohibiting the possession, in prison of "any controlled substance."

2. **Base Offense Level**

The amount of drugs from all three counts nets a base offense level 32. Section 2D1.1(c)(5), comment. (n.8(b)) of the U.S. Sentencing Guidelines, instructs that when multiple controlled substances are involved, a combined base offense level should be obtained by converting each of the drugs to its Converted Drug Weight (CDW). At the trial, the Government proved that GRAVES conspired to distribute 210.2 grams of methamphetamine (actual) (131.1 grams sold to a confidential informant during a series of controlled purchases (count 1) and another 79.1 grams stored in his residence (count 3)) which converts to 4,204 CDW. U.S.S.G. § 2D1.1 [n.8(D)]. Adding that CDW to the 2,272 kilograms (5,000 pounds) of marijuana proven in Count 2, results in a total of 6,476[3] CDW. Thus, the base offense is 32.

3. **Adjustments and Specific Offense Characteristics**

    a.  Possession of Firearm:    +2    U.S.S.G. § 2D1.1(b)(1)

When agents executed a search warrant at GRAVES's residence on April 24, 2014, they found two loaded firearms and ammunition in his residence, along with digital scales, boxes of latex gloves, a money counter, dozens of small zip-log bags, pay and owe sheets, and 79.1 grams of methamphetamine in the freezer. Numerous personal items and a lease agreement were also found, showing GRAVES's dominion and control over that residence.

    b.  Role Adjustment:    +4    U.S.S.G. § 3B1.1(a)

Section 3B1.1(a) provides for a 4-level increase upon a finding that the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). "To qualify for an adjustment under this section, the defendant must have been an organizer, leader, manager, or supervisor of one or more participants." U.S.S.G. § 3B1.1, cmt. n.2. The adjustment is

---

[3]    The PSR reached a different amount of marijuana (9,204 kilograms), in part, because it used 5,000 kilograms (as opposed to 5,000 pounds) of marijuana. This does not change the base offense level. Under either amount, the base offense level is 32.

included primarily because "persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1, background.

District courts are further guided by the following factors relevant to a defendant's conduct:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4.

A district court may impose this enhancement if there is evidence that the defendant "exercised some control over others involved in the commission of the offense" or "was responsible for organizing others for the purpose of carrying out the crime." United States v. Ingham, 486 F.3d 1068, 1074 (9th Cir. 2007) (citing and quoting United States v. Avila, 95 F.3d 887, 889 (9th Cir. 1996)).  It is not necessary that the district court make specific findings of fact to justify the imposition of the role enhancement.  United States v. Lopez Sandoval, 146 F.3d 712, 716 (9th Cir. 1998). There must, however, be evidence in the record that would support the conclusion that the defendant exercised the necessary level of control.  Id. at 717.

Here, the record shows that GRAVES was an "organizer or leader of a criminal activity that involved five or more participants."  Even putting aside his role in the West Coast Crips gang and focusing on the marijuana conspiracy alone, GRAVES organized and recruited five participants, including codefendants Luis Salgado, Dameon Shelton, Cleotha Young, and FNU LNU, aka Smurf, to travel to Lompoc, California to unload a boat full of marijuana.  GRAVES also recruited Solcamire Castro-Hernandez and Gaquayla Lagrone to rent a car and a van to further the marijuana conspiracy.  See PSR at 13-14.

The PSR also documents several occasions in which GRAVES provided controlled substances to others, for further distribution, during the investigation, and acquired controlled substances for distribution to others:

- November 2, 2013: GRAVES sells Franklin ¼ ounce of powder cocaine and ¼ of crack cocaine for $320 [PSR at ¶ 34-35];
- On November 3, 2013, GRAVES provided drugs to Harrison [PSR at ¶ 37];
- On November 4, 2013, GRAVES brokered the sale of 1/8 of an ounce of narcotics with Butler [PSR at ¶ 39];
- In November 2013 GRAVES supplied Lagrone with 1 ounce of cocaine [PSR at ¶ 40];
- On November 9, 2013, GRAVES sold Whittle 1/8 of an ounce of narcotics [PSR at ¶ 43]
- On November 13, 2013, GRAVES and Shelton arranged to deliver a package containing 5.5 pounds of Marijuana. [PSR at ¶ 45]
- On November 1, 2013, GRAVES agreed to purchase two kilograms of cocaine from Salgado for $26,000 per kilogram. [PSR at ¶ 49]
- On November 12, 2013, GRAVES mailed a package containing 1.13 kilograms of cocaine to Ohio. [PSR at ¶ 51]. On December 3, 2013, GRAVES directed co-defendant Castro-Hernandez to mail a package containing narcotics. [PSR at ¶ 52]

GRAVES also boasted of his status as a leader and organizer within the WCC gang. On November 30, 2013, GRAVES said he was "highly decorated" within the WCC because over his 35-year career as a WCC member, he had "5, 6 bodies" (killed five or six people) and a result younger gang members respected him as a "G." [PSR at ¶ 53].[4]

---

[4] GRAVES himself acknowledged to the Probation Officer that others looked up to him as a "G" in the WCC. [PSR at ¶ 85.b)]

There is abundant evidence that GRAVES "exercised some control over" or was "responsible for organizing" others. This includes the off-load crew, the mailings, and the multiple street-level sales to other gang members. See Ingham, 486 F.3d at 1074. Accordingly, the Court should impose a 4-level role enhancement under § 3B1.1(a).[5]

c.   Obstruction of Justice:        +2        U.S.S.G. § 3C1.1

Section 3C1.1 provided for a 2-level upward adjustment upon a finding that the defendant (1) "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . ." U.S.S.G. § 3C1.1.    Covered conduct includes, among other things, "committing . . . perjury." U.S.S.G. § 3C1.1, cmt. n.4(B).  A district court applying the enhancement based on perjury must expressly find that (1) the defendant gave false testimony, (2) on a material matter, (3) with willful intent.  United States v. Castro-Ponce, 770 F.3d 819, 822 (9th Cir. 2014).

The record here supports a finding of each perjury element.  First, GRAVES falsely testified at trial, among other things, that he did not deliver methamphetamine to the confidential source on four separate occasions, that the white object in his hand captured on a body-camera worn by the confidential source was a napkin and at one point a phone, not methamphetamine, and that the methamphetamine found in his house belonged to someone else.[6]  Second, concerning the methamphetamine charges, the

---

[5]    The enhancement is also supported by the evidence introduced at trial as to GRAVES' methamphetamine distribution conspiracy, which showed that GRAVES coordinated and organized more than four individuals in that conspiracy.

[6]    In his statement to the probation officer, GRAVES now states that he does not deny any of the allegations of drug trafficking and that he takes "full responsibility for selling drugs." The Court should give no weight to that statement. Under oath, GRAVES swore to the contrary specifically denying the acts underlying this conviction. Now, having been convicted of the crime – and with his conviction affirmed by the Court of Appeals – GRAVES has every incentive to say whatever he can to garner

8

contested issues at trial were whether GRAVES distributed and possessed the methamphetamine. In other words, GRAVES' false testimony was material in that if believed it would have affected the jury's determination of his guilt.[7] See United States v. McKenna, 327 F.3d 830, 839 (9th Cir. 2003). Finally, GRAVES' false testimony was willful, because it was not the "result of confusion, mistake, or faulty memory." United States v. Jimenez, 300 F.3d 1166, 1170 (9th Cir. 2002).

### 4. Adjusted Offense level and Guideline Range

A base offense level of 32 with adjustments for possession of a firearm (+2), aggravated role (+4), and obstruction of justice (+2) results in an adjusted offense level of 40. With 12 criminal history points, GRAVES is in criminal history category (CHC) V. Adjusted offense level 40 and CHC V, results in a guideline range of 360 to life.

## B. Relevant Conduct

Section 1B1.3 directs the Court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and which were "within the scope of the jointly undertaken criminal activity" and were "in furtherance of that criminal activity" and were "reasonably foreseeable in connection with that criminal activity."

18 U.S.C. § 3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Federal Rule of Criminal Procedure 32(d)(2)(A)(iii) states

---

sympathy. The Court should also consider whether GRAVES made similar statements of contrition to the seven judges who previously sentenced GRAVES for felony convictions.

[7] In preparing for his prior sentencing hearing, GRAVES argued that the obstruction of justice enhancement does not apply because jurors informed his attorney that his testimony "played no meaningful role" and "did not impede the jury" in finding him guilty. Dk No. 1210 at 4. However, "perjury does not have to actually impede a prosecution or trial" to qualify for the obstruction enhancement. United States v. Johnson, 812 F.3d 757, 762 (9th Cir. 2016).

that presentence reports must contain "the defendant's history and characteristics, including . . . any circumstance affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment."

The Court may consider this information in determining where to sentence a defendant within the guideline range, or whether to depart from the guideline range. U.S.S.G. § 1B.1.4.

**1. <u>There is clear and convincing evidence that GRAVES counseled, commanded, induced, or procured Paris Hill's murder</u>**

The majority of the statements included in the PSR referencing violence come from GRAVES and his codefendants in the numerous wiretap recordings that were intercepted during the investigation. Together with other evidence introduced over the course of these proceedings, those wiretap recordings provide clear and convincing evidence[8] that GRAVES "counseled, commanded, induced, or procured" the murder of Paris Hill in connection with the WCC's drug distribution activities.

---

[8]     In *Valensia,* the Ninth Circuit identified several factors in determining whether a District court considering relevant conduct at sentencing should require a preponderance of the evidence or clear and convincing evidence when finding facts that bear on a sentence. *United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir.2000), *cert. granted, judgment vacated, and remanded by* 532 U.S. 901, 121 S.Ct. 1222, 149 L.Ed.2d 133 (2001). *Valensia* held that the clear and convincing standard applies when the relevant facts would have a "disproportionate effect" on the sentence. To determine whether there is a "disproportionate effect" the sentencing court should balance several factors including: (1) whether "the enhanced sentence fall[s] within the maximum sentence for the crime alleged in the indictment;" (2) whether "the enhanced sentence negate[s] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;" (3) whether "the facts offered in support of the enhancement create new offenses requiring separate punishment;" (4) whether "the increase in sentence [is] based on the extent of a conspiracy;" (5) whether "the increase in the number of offense levels [is] less than or equal to four;" and (6) whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence." *Id.* Here, out of an abundance of caution, the United States proposes that the Court apply a clear and convincing standard

Paris Hill was shot in the head early in the morning of March 1, 2014, in front of a night club, the Common Grounds, in San Diego, California.  See Declaration of Special Agent Katie Harding (Harding Dec.) at ¶ 16. Police found Hill's body lying on the sidewalk near the corner of 47th street and Federal Boulevard. Id. Intercepted phone calls indicate that co-defendants and WCC members Terry HOLLINS, GRAVES, Jermain COOK and Donald BANDY were present at the Common Grounds immediately prior to Hill's murder.  A jury later found HOLLINS guilty of Hills murder, and the Court sentenced HOLLINS and COOK to life in prison.

Paris Hill's murder arose out of his status as a witness to a prior WCC murder and his perceived cooperation with law enforcement in that investigation. In October 2013, WCC member Jeffrey "JJ" Rees was stabbed and killed in a fight orchestrated by WCC member and co-defendant Wilbert ROSS.  Harding Dec. at ¶ 12.  Hill, also a WCC member, was present at the scene and provided statements to the police. Subsequently, ROSS was charged with Rees' murder.  Id.

In January 2013, the District Attorney's office released discovery containing Hill's statements.  ROSS, at that time detained in county jail, received that discovery. GRAVES later commented that Butler (detained in the same jail) also saw the discovery. Harding Dec. at ¶ 12.

By early February 2014, news of Hill's perceived cooperation with law enforcement had spread from the county jail to HOLLINS, who was out on bond and also awaiting trial on an armed robbery charge.  Upon receiving that news, HOLLINS sought GRAVES' advice.  On February 7, 2014, GRAVES received a text message from HOLLINS requesting an urgent meeting.  GRAVES agreed to meet and he described that meeting on a call to co-defendant Solcamire Castro-Hernandez a few hours later.  GRAVES said HOLLINS, who he called his "young general," was seeking

---

in determining whether to find that GRAVES is accountable for the murder of Paris Hill by relevant conduct.

advice about a gang member who was cooperating with law enforcement authorities. GRAVES said, "[persons][9] is facing life sentences and everything . . . they don't think muthafucka know, this [person] don't think a muthafucka know he done did this shit." Castro-Hernandez asked GRAVES if they had "paperwork" [documents showing cooperation]. GRAVES affirmed and said, "somebody say he thinking he [the suspected cooperator] might be still working [serving as a confidential informant]." GRAVES said that he told HOLLINS: "I don't object . . . whatever you all feel you all need to do . . . handle it . . . it's not like, not an order . . . [it is] in violation and violations get dealt with. Period." Harding Dec. at ¶ 13.

Agents immediately began investigating the identity of the person at issue in that February 7, 2013 call and soon formed a theory that the person at issue was Hill.

On February 22, 2014, GRAVES told WCC associate and co-defendant Gaqualya LAGRONE that HOLLINS was getting stressed about a suspected cooperator. GRAVES said that those who speak to law enforcement must be killed: "if motherfuckers been telling, they gotta go . . . I don't give a fuck if its Kiki[10] or whoever the fuck with the rest of them [persons] that's supposed to be on paperwork [government documents showing cooperation] . . . they gotta go, period." Harding Dec. at ¶ 15.

Almost immediately after Hill was murdered GRAVES' undertook efforts to cover his tracks. On March 3, 2014, GRAVES and COOK were intercepted discussing a young male who was present at the party, got drunk, and took his shirt off wanting to start a fight. GRAVES said he was concerned because that person left his shirt at the scene and the police could identify that person through the DNA on the shirt, with the inference that the person would then identify others who were present. GRAVES told

---

[9]     For purposes of this memorandum, the generic term "person" is substituted for GRAVES' (and others') use of a more racially charged term carrying similar meaning.

[10]    "Kiki" is Krystal Sharkey, a pregnant woman shot by WCC/3-Babiez member Antwaren Roberts on December 1, 2013, over her perceived cooperation with law enforcement.

COOK to tell that person to "watch his fucking mouth." COOK said, "ok, for sure, I'm going to deal with that right now." GRAVES added, "Aight, everything else covered but yeah cover that one. Get up on that one immediately." Harding Dec. at ¶ 19.

On March 3, 2014, HOLLINS' was arrested on a pre-trial release violation. On March 4, 2014, COOK informed GRAVES that HOLLINS had been arrested and that officers had searched HOLLINS' house. When COOK began to speak about a new subject, GRAVES cut him off and suggested they meet in person. Agents followed GRAVES to a residence where agents had previously installed a pole camera. Agents observed COOK meet with GRAVES on the pole camera. Harding Dec. at ¶ 21.

GRAVES spoke to BANDY following his meeting with COOK. GRAVES referenced the individual who left his shirt at the party. BANDY said he knew the person GRAVES had in mind and said he had not yet been able to reach him but would "holler" at him when he found him. GRAVES then asked if BANDY had spoken with "Trey-O" [COOK] about a separate matter that GRAVES and COOK had discussed. BANDY affirmed. GRAVES told BANDY to "get on that" as soon as possible. Harding Dec. at ¶ 22.

Subsequent calls reveal that the subject of COOK's and BANDY's meetings with GRAVES was the murder of "DF." DF drove HOLLINS, COOK, and BANDY to and from the scene of Paris Hill's murder and was thus a witness to that crime. First, on March 5, 2013, GRAVES told co-defendant YOUNG that the District Attorney had confirmed that gang members were "on paper" (their cooperation with law enforcement was documented): "it's official . . . [persons] is tellin [talking to law enforcement]."[11] Harding Dec. at ¶ 23. GRAVES said the WCC would no longer wait until after someone testified because "[o]nce they testify it's too late! . . . Witnesses gotta go now!" Harding Dec. at ¶ 12. GRAVES explained that gang members had the "paperwork," but could

---

[11] GRAVES also told YOUNG that HOLLINS was motivated to murder Hill because Hill could implicate HOLLINS in the April 2013 murder of Meashal Fairly. GRAVES said that Hill held a gun for HOLLINS the night Fairly was killed.

not pass it out because the distribution of such paperwork would be used as evidence against them.   GRAVES said that other WCC members in the jail had seen the paperwork, "BK [Butler][12] and them [persons] seen it," and their word was sufficient, in GRAVES' mind, to make it "official."  Id. At the end of this conversation, GRAVES commented to YOUNG:  "they can't get this [UI] cause he's talking about killing that bitch [DF]." Harding Dec. at ¶ 25.  In context, GRAVES' reference to "he" can only mean HOLLINS.

The threat to "DF," introduced on March 5, 2014, became even clearer on March 13, 2014, when GRAVES explained to co-defendant Brenda Rodriguez (who was living with BANDY at that time) that when he had earlier met with COOK, he told COOK to murder "DF":

> I swear to God, you can ask that [person] Trey-O [COOK] what I told em, I said [person] we'll have to do the bitch [DF] . . . the bitch probably told them the whole plot [because DF could name who was present that night] . . . if it was my call to make, I'd snatch that bitch and have that bitch tied up some mother fucking where . . . next time you all see this bitch, it'll be in a body bag.

Harding Dec. at ¶ 26.

GRAVES provided specific details that identified "DF" as the target, and concluded that because "DF" was probably in protective custody and out of reach, they needed to go after "DF's" family:

> (U/I) fuck how big the family is and what they going to do, . . . we gonna knock as many of you mother fuckers off until that time comes . . . we lose 2-3 homies, 2-3 mother fuckers in your family got to go . . . you run your mouth, you die, period . . . .

Harding Dec. at ¶ 27.

Further evidence of GRAVES's counsel to HOLLINS to murder Paris Hill comes from HOLLINS's own admission, on a secretly recorded jail conversation, that GRAVES gave him the "nod" immediately prior to Hill's murder. By March 18, 2014,

---

[12]   Butler had been jailed with ROSS following a high-speed pursuit with police in December 2013, after GRAVES gave Butler a firearm.

14

HOLLINS and co-defendants FOREMAN and BUTLER were sharing a jail cell. Agents installed a recording device in the cell and captured the two discussing the Paris Hill's murder. Foreman asked HOLLINS, "where was he [Paris Hill] laying anyway? HOLLINS said, "where you come out the gate . . . the back gate . . . probably about ten or fifteen feet." HOLLINS then described how he received GRAVES's approval immediately prior to shooting Paris Hill: "you know me, I know the political stand point. I went back to Sweets [GRAVES], let me holla at you . . . Sweets [GRAVES] is looking at me like this, you know what I mean . . . I've been getting nods, like, from the [persons] that I want to get the nods from." Harding Dec. at ¶ 31 HOLLINS went on to state Graves specifically gave him a "blue light" – permission to murder a fellow gang member – in connection with Paris Hill's murder. Harding Dec. at ¶ 33.[13]

On these facts, the Court should find by clear and convincing evidence that GRAVES used his influence as a respected "G" in the WCC to counsel, command, induce, or procure the murder of Paris Hill. The Court should "receive and consider [these facts] for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

//

//

//

//

---

[13]    In his statement to the Probation Officer, GRAVES said that he generally approves of a snitch being killed, but denied that he specifically authorized the murders of Hill and LaGrone. PSR at t ¶ 85.b. GRAVES conclusory denial is belied by specific instances, recorded and documented, when GRAVES did, in fact, counsel HOLLINS to murder Paris Hill. When HOLLINS – who confessed to pulling the trigger for Paris Hill's murder – sought GRAVES's counsel in the weeks prior to Hill's murder, GRAVES told HOLLINS: "handle it . . .  it's not like, not an order . . . [it is] in violation and violations get dealt with.  Period." Then, at the party, just before HOLLINS walked out with Paris Hill and shot him in the head, he met with GRAVES and got the "blue light" of approval required to murder another WCC member. Harding Dec. at ¶33. (HOLLINS: "You know me, I know the political stand point. I went back to Sweets [Graves], let me holla at you.").

15

**2. <u>There is clear and convincing evidence that GRAVES provided firearms to other gang members and directed CASTRO to work as a prostitute.</u>**

During the investigation agents intercepted calls in which GRAVES sent co-defendant Solcamire CASTRO to Arizona to work as a prostitute for GRAVES and procure firearms and ammunition for GRAVES. PSR at ¶¶ 13, 41.

On December 6, 2013, GRAVES gave co-defendant BUTLER a loaded firearm. Local law enforcement attempted to stop BUTLER after he obtained the gun from GRAVE and BUTLER led police on a high-speed chase, during which he threw the firearm out the car window. PSR at ¶ 55. Agents intercepted BUTLER telling GRAVES where he threw the gun, and later that night GRAVES went to the area to search for the gun by the side of the road, but police had already retrieved it. PSR at ¶ 55.

**C. <u>The 18 U.S.C. 3553(a) Factors Support a Life Sentence</u>**

**1. The nature and circumstances of the offense and GRAVES's history and characteristics**

An analysis of the 18 U.S.C. § 3553(a) factors supports a sentence of life imprisonment. Beginning with the nature and circumstances of the offense, the jury convicted GRAVES of conspiracy to distribute methamphetamine, conspiracy to distribute marijuana, and possession with intent to distribute methamphetamine. Though these were the offenses of conviction, the record shows GRAVES'S involvement in Paris Hill's murder, its cover up, sex trafficking, and multiple instances of drug sales.

The next factor, the history and characteristics of the defendant, are troubling. Like other codefendants in this case, GRAVES declined to participate in the presentence interview. However, the record shows that GRAVES is a respected member of the WCC, with a lengthy criminal history.

Among other convictions, GRAVES was convicted in 1984 for killing of a rival gang member. GRAVES pled guilty to voluntary manslaughter and was sentenced to 11 years in prison. PSR at ¶ 103. GRAVES and seven other gang members pursued a

rival gang member and GRAVES struck the victim on the head with a baseball bat, killing him. PSR at ¶ 103. GRAVES gave orders during the melee and told other gang members to join the assault. PSR at ¶ 103. While in custody awaiting trial for this killing, GRAVES and another codefendant assaulted a witness. GRAVES pulled down the victim's underwear and said, "Man, do you know what we can do to you?" PSR at ¶ 104. GRAVES then hit the victim in the face, and served as the lookout while his codefendant attempted to sodomize the victim. PSR at ¶ 104. The victim was released and threatened, "If you tell, we'll get you." PSR at ¶ 104. GRAVES pled guilty to preventing or dissuading a witness by force from giving testimony. Summarizing GRAVES' criminal record and dangerousness, the probation officer's report prepared in 1984 stated that GRAVES' "prior record shows a pattern of violent conduct indicating that [GRAVES] is a danger to others."

In 2002, GRAVES pled guilty to possessing, transporting, and selling cocaine, and was sentenced to eight years in state prison. While serving his sentence in Centinela State Prison, GRAVES was charged with possessing heroin and marijuana. GRAVES ultimately admitted that prison staff "found marijuana in my cell."

The PSR also references numerous occasions when law enforcement officers encountered GRAVES working as a pimp, including in 1992 [PSR at ¶ 108], 1994 [PSR at ¶ 109], and 2002 [PSR at ¶ 111].

In addition, GRAVES has boasted about past violent crimes he has committed. During an intercepted call, GRAVES stated, "I got multiples on my jacket . . . I don't think [there are] too many mother fuckers [as] highly decorated the way I am. I know I got 5, 6 bodies [killed 5 or 6 people]."

Section 3553(a)(2)(C) provides that, in imposing a sentence, the district court should consider the need "to protect the public from further crimes." It was true in 1984 and it is true today, GRAVES' criminal record shows a pattern of violent conduct indicating that he is a "danger to others."

Moreover, neither his 11-year sentence for voluntary manslaughter nor his 8-year sentence for distributing crack cocaine, nor any of the other five felony sentences GRAVES has suffered have deterred him from committing the instance offenses.  A life sentence is necessary to provide specific deterrence to GRAVES who continued his criminal conduct despite seven prior felony convictions. Far from deterring GRAVES, those seven prior felonies only served to intensify his criminal conduct. For over forty years, GRAVES has refused pleas by judges to take responsibility for his crimes. A life sentence is necessary to finally stop GRAVES' unrelenting criminal conduct.

A life sentence is also necessary to provide general deterrence to others who may see in GRAVES a leader to be followed. This investigation has demonstrated that GRAVES is a charismatic leader who inspired many others to follow his crimes: whether they are the street level drug dealers who bought ounces of methamphetamine from GRAVES, the offload crew who tried to import two tons of marijuana, or the murderers who tried to silence witnesses to WCC crimes. Many others looked to GRAVES for leadership. A life sentence is necessary to provide general deterrence to those who would follow after GRAVES.

A life sentence takes into account all of the § 3553(a) factors, including the guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the public, and specific and general deterrence.

## 2. The Court should impose a life sentence to avoid unwarranted disparities to similarly situated defendants

18 U.S.C. Section 3553 (a) (6) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here GRAVES was charged with engaging in a RICO conspiracy with co-defendant's Terry HOLLINS, Jermaine COOK, Wilbert ROSS, and Marcus FOREMAN. While GRAVES was severed from their trial, GRAVES' conduct throughout the investigation overlaps with HOLLINS, COOK, ROSS and FOREMAN, each of whom received a life sentence. To avoid disparities

with these similarly situated co-defendants, GRAVES should also receive a life sentence.

## IV

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should follow the sentencing guideline calculations enumerated above and sentence GRAVES to the high end of the advisory guideline range: life in prison as to each count, to run consecutively.

DATED:  July 15, 2022                              Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney
<u>/s/ Stephen H. Wong</u>
Stephen H. Wong
Assistant United States Attorney