1  RANDY S. GROSSMAN
   United States Attorney
2  STEPHEN H. WONG
   Assistant U.S. Attorney
3  California Bar No. 212485
4  880 Front Street, Room 6293
   San Diego, CA 92101
5  (619) 546-9464
6
7  Attorneys for the United States

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          Case No.: 14-CR-1288-DMS

11          Plaintiff,                 **DECLARATION OF SUPERVISORY
                                       SPECIAL AGENT KATIE HARDING IN
12      v.                             SUPPORT OF THE UNITED STATES'
                                       SENTENCING MEMORANDUM**
13  RANDY ALTON GRAVES (1),

14          Defendants.

15

16

17

18  I, Katie Harding, declare as follows:

19

20      1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

21  been so employed since June 2004.  I am currently assigned to the San Diego Field Division

22  working as the Supervisory Special Agent (SSA) of the San Diego East County Regional

23  Gang Task Force (ECRGTF) in El Cajon, California. My duties include the supervision

24  of approximately six FBI Special Agents, three FBI support staff, and 10 federally

25  deputized Task Force Officers during the investigation and apprehension of individuals

26  involved in violent gang-related activities as well as drug trafficking and distribution. I

27                                    1

28

provide mentoring and leadership to members of the task force to include approving all administrative documents and overseeing operations such as surveillances and warrant service. Prior to my current role, I was a Special Agent assigned to the ECRGTF and the Violent Crime Task Force-Gang Group, as well as an SSA for the Safe Streets and Gang Unit at FBI Headquarters. Prior to joining the FBI, I was employed as a Forensic Scientist with the Oregon State Police. In that position, I processed crime scenes and examined evidence.

2.      As a FBI Special Agent and Supervisory Special Agent, I have participated in over 100 arrests for narcotics-related and gang-related offenses. I have participated in over 20 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, and the interview of confidential sources. Through training and participation in these investigations, I have gained insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out their violent crime and drug trafficking activities.

3.      I have participated in several investigations into San Diego-area street gangs. I was the co-case agent on two investigations that led to the arrest and prosecution of nearly 100 Mexican Mafia members, associates, and soldiers. These investigations led to numerous charges being filed, including racketeering (with predicate acts of murder, attempted murder, and robbery), extortion, drug trafficking, and various firearms offenses. We employed a variety of investigative techniques in these investigations, including Title-III interceptions of wire communications, consensual monitoring of communications, undercover operations, and confidential informants. I have interviewed dozens of gang members and associates from Hispanic gangs such as Mexican Mafia and black gangs such as the West Coast Crips (WCC). Through the course of these investigations, I have gained

1  substantial knowledge of the internal rules and operating codes that govern San Diego

2  gangs as well as the investigative techniques necessary to investigate them successfully.

3      4.    This declaration is being submitted for the limited purpose of establishing

4  defendant Randy Grave's involvement in the murder of Paris Hill on March 1, 2014. I have

5  not set forth each and every fact learned during the course of this investigation.

6      5.    I served as one of a team of four case agents in Case No. 14-cr-1288-DMS,

7  United States v. Randy Alton Graves et. al., and in that capacity I am familiar with the facts

8  of this case. As a case agent for the investigation, I listened to thousands of phone calls by

9  and between members of the West Coast Crips street gang.

10      6.    Based on my review of thousands of intercepted calls by WCC members and

11  interviews with current and former WCC members (including interviews by other law

12  enforcement officers who have passed their information on to me), among other things, I

13  know that in 2013 and 2014, Randy Graves occupied a leadership role in the WCC gang.[1]

14  As such, Graves supplied other WCC members with narcotics and firearms, and he

15  enforced WCC rules. Graves specifically enforced the WCC rule against any WCC

16  member cooperating with law enforcement. Graves frequently spoke about this to other

17  WCC members and associates. As explained further below, Graves spoke about Paris Hill's

18  cooperation with law enforcement, and Graves specifically approved Paris Hill's murder

19  moments prior to the murder, as evidenced by WCC member Terry Hollins' statement that

20  prior to murdering Hill he received Grave's approval.

21      7.    The WCC is extremely hostile to any WCC member or associate who

22  cooperates with law enforcement.  For example, in the fall of 2013, the WCC committed

23

24  _____

25  [1] My review of phone calls associated with this investigation, along with interviews and
observations in court, also provides a basis for identifying the participants in the calls and

26  conversations referenced thorough this affidavit.

27                                      3

28

several acts of violence motivated, in part, over perceptions that the victims were cooperating with law enforcement authorities.

8.     Similar to other street gangs, the WCC operates according to a code or set of rules that regulates intra-gang violence.  One of those rules is for its members not to cooperate with law enforcement authorities.  WCC members can be killed if cooperation is proven and approved by senior WCC members. The WCC rules generally prohibit one WCC member from killing another member except with approval of a senior WCC member, an "OG," upon a showing of credible evidence of cooperation.  The documentary evidence is often referred to as "paperwork."

9.     Within a gang, there is a difference between seeing documentation of another gang member's cooperation and being able to provide "paperwork" to other gang members to prove that cooperation.  There is also a difference between one gang member seeing documentation and an entire group of gang members repeatedly seeing the documents.  It is much easier for a group of gang members to convince the gang a person is cooperating than for a single gang member to do so.

10.     Through my experience investigating gangs, I know it is essential for any gang with incarcerated members to be able to communicate gang business with members and associates still in the community.

11.     Monitoring in-custody gang members' phone conversations is one way law enforcement officers attempt to monitor a gang's communications between gang members, but for a number of reasons, monitoring phone conversations is a limited investigative tool. First, inmates can, and frequently do, disguise their communications by borrowing from other inmates the phone identification numbers that jails use to keep track of inmate phone calls.  Second, inmates frequently use coded language to disguise their communications. Third, even if law enforcement is able to track an inmate's phone calls and decipher the code, it can be very time-consuming to distill the relevant information from many phone

4

1     calls and, if law enforcement is trying to identify a threat they believe to be imminent,

2     listening to recorded phone calls is often inadequate to address the threat.  Finally, another

3     method that inmates use to subvert jail phone-call monitoring is the use of three-way calls

4     to avoid jail-officials identifying the callers.

5            12.     An example of the WCC rules against cooperation with law enforcement is

6     provided by Terry Hollins' interactions with Randy Graves between February 7, 2014, and

7     early March 2014.  As background, in October 2013, WCC member Jeffrey Rees was

8     stabbed and killed in a fight orchestrated by WCC member and co-defendant Wilbert Ross.

9     WCC member Paris Hill was present at the scene and provided statements to police.  Ross

10     was charged with murder.  In January 2014, the District Attorney's office released

11     discovery containing Hill's statements to Ross (through his attorney), who was then

12     detained in county jail.  News of Hill's perceived cooperation with law enforcement spread

13     quickly from the county jail to WCC members outside of the jail.

14            13.     On February 7, 2014, Hollins sent Graves a text message requesting an urgent

15     meeting.  Graves described their meeting to co-defendant Solcamire Castro-Hernandez on

16     an intercepted phone call a few hours later.  Graves said his "young general [Hollins]"[2]

17     was seeking advice about a gang member who was cooperating with law enforcement.

18     Graves said, "[persons][3]  is facing life sentences and everything . . . they don't think

19     muthafucka know, this [person] don't think a muthafucka know he done did this shit."

20     Castro-Hernandez asked Graves if they had "paperwork" [documents showing

21

22

---

23    [2]      Based on the context and timing of the conversation, among other things, I believe

24    that Graves was referring to Hollins.

25    [3]      For purposes of this declaration, the generic term "person" is substituted for Graves'

26    (and others) use of a more racially charged term carrying similar meaning.

27                                  5                            *14-CR-1288-DMS*

28

1  cooperation].[4]  Graves affirmed and said, "somebody say he thinking he [the suspected

2  snitch] might be still working [serving as a confidential informant]."  Graves said that he

3  told Hollins: "I don't object . . . whatever you all feel you all need to do . . . handle it . . .

4  it's not like, not an order . . . [it is] in violation and violations get dealt with. Period."

5      14.  Agents immediately began investigating the identity of the person at issue in

6  that February 7, 2014, call.  Within approximately 10 days, my team had formed a theory

7  the person at issue was Paris Hill. That theory was based on intercepted calls referencing

8  the suspected cooperator's association with WCC associate, and co-defendant, Gaqualya

9  Lagrone. Agents were aware Lagrone was in a relationship with Paris Hill, and they soon

10  became aware Paris Hill was one of the witnesses in Ross's murder case whose statements

11  to law enforcement were disclosed in discovery for that case.  Hill had ceased contact with

12  his probation officer and law enforcement officers and agents were unsuccessful in locating

13  Hill to warn him.

14      15.  Intercepted calls indicate that approximately one week prior to Hill's murder,

15  Graves counseled Hollins and approved the murder.  On February 22, 2014, during an

16  intercepted call, Graves told Lagrone that Hollins was getting stressed about the suspected

17  cooperator.  Graves said that those who speak to law enforcement must be killed: "if

18  mother fuckers been telling, they gotta go . . . I don't give a fuck if its Kiki [a WCC member

19  who was shot multiple times by another WCC member in December 2013] or whoever the

20

21

---

22  [4]  My interpretations of coded phrases are set forth throughout this declaration in
brackets.  Those interpretations are based on, among other things, my experience as an FBI

23  agent and supervisory agent, as set forth above.

24  Grave's reference to Hollins as "his young general" reflects Grave's belief that he,
Graves, held authority over other WCC members. Throughout the investigation Graves

25  spoke with the belief that his directives would be obeyed. Other gang members who were

26  intercepted also acted with deference to Graves.

27                                               *14-CR-1288-DMS*

28

1  fuck with the rest of them [persons] that's supposed to be on paperwork [government

2  documents showing cooperation] . . . they gotta go [be killed], period."

3     16.    Paris Hill was shot in the head early in the morning of March 1, 2014, in front

4  of a night club, the Common Grounds, in San Diego, California.  Police found Hill's body

5  lying on the sidewalk near the corner of 47th street and Federal Boulevard, a short walk

6  and slightly down-hill from the gate of the Commons Grounds.

7     17.    Intercepted phone calls indicate Hollins, Graves, Jermaine Cook and Donald

8  Bandy were present at the Common Grounds immediately prior to Hill's murder.

9     18.    On March 1, 2014, several hours after Hill was murdered, Graves was

10  intercepted speaking to Castro-Hernandez reflecting on how several gang members were

11  upset at Hill's murder because "[t]hey don't feel that [persons] got all the paperwork

12  [documents showing cooperation] and they [are] mad because they said them [persons]

13  moved only because of cuz [a fellow WCC gang member] word and all this."  Graves

14  explained that if you are a gang member and you see "paperwork" on somebody you need

15  to "handle you[r] business."  Graves went on to explain what he meant by that:

> If you got reputable [persons] that [are] in place to see this and they said it's
> a foul ball and it's a green light [gang authorization to kill someone] or blue
> light [the Crip translation for a "green light"]. . . should a mother fucker wait
> until after he go through the damage and testify on a mother fucker and give
> a mother fucker a life sentence or some more shit or should a mother fucker
> handle the business and prevent a mother fucker from doing it [by killing the
> cooperating witness.]

22  Graves further stated:

> [Persons], this [violent acts against cooperators] is your job [a gang member's
> duty and expectation]. . . that's why shit be happening and shit get loose
> because some of these [persons] don't want to get up and do what they
> supposed to be doing when they supposed to do it.  They getting lazy . . .

7

*14-CR-1288-DMS*

[Person] when duty calls, [person] sometimes you got to step aside cuz you might save a life [person].

19.     On March 3, 2014, Graves and Cook were intercepted discussing a young male who was present at the party, got drunk, and took his shirt off wanting to start a fight. Graves said he was concerned because that person left his shirt at the scene and the police could identify that person through the DNA on the shirt, with the inference that the person would then identify others who were present. Graves told Cook to tell that person to "watch his fucking mouth." Cook said, "ok, for sure, I'm going to deal with that right now." Graves added, "Aight, everything else covered but yeah cover that one. Get up on that one immediately."

20.     Also on March 3, 2014, Hollins' pre-trial release was revoked and he was arrested.

21.     On March 4, 2014, Cook informed Graves that Hollins had been arrested and that officers had searched Hollins' house. When Cook began to speak about a new subject, Graves cut him off and suggested they meet in person. Agents observed Cook meet with Graves on a pole camera.

22.     Graves spoke to Bandy following his meeting with Cook. Graves referenced the individual who left his shirt at the party. Bandy said he knew the person Graves had in mind and said he had not yet been able to reach him, but would "holler" at him when he found him. Graves then asked if Bandy had spoken with "Trey-O" [Cook] about a separate matter that Graves and Cook had discussed. Bandy affirmed. Graves told Bandy to "get on it" as soon as possible.

23.     On March 5, 2014, Graves told co-defendant Cleotha Young the District Attorney had confirmed in open court people were "on paper," cooperating with law enforcement. Graves said, "its official . . . [persons] is tellin [talking to law enforcement] . . . they on paper, they done made statements, [person], its official mother fuckers can't

8

1  say nothing about whatever happened to whoever . . . everyone know it now." Graves also

2  said that, as a result, the WCC would no longer wait until after someone testified:

3  "Witnesses gotta go [be eliminated] now!" Graves explained that gang members had the

4  "paperwork" but could not pass it out because the distribution of such paperwork would be

5  used as evidence against them. Instead, they showed it to fellow gang members. Graves

6  said that "BK and them . . . [other WCC members] seen it [paperwork]," and their word

7  was sufficient to make it "official."

8      24.    I interpret Graves' statement "BK and them [persons] seen it" to reference

9  Graves receiving confirmation of Hill's cooperation from his cousin, co-defendant and

10 fellow WCC member Darnell Butler, who was then detained along with Hollins in the

11 George Bailey Detention Center. I understand Graves to be saying that Wilbert Ross had

12 shared with fellow WCC gang members, including Butler, the discovery showing Paris

13 Hill had provided statements to law enforcement. Butler, in turn, communicated with

14 Graves he had seen the documentation, which was sufficient for Graves.

15     25.    Graves then went on to add: "they can't get this (U/I) cause he's talking about

16 killing that bitch [DF]." "DF" was Terry Hollin's then girlfriend. Video from a nearby

17 convenience store showed Hollins and Hill together in DF's vehicle the same evening that

18 Hill was murdered. Cook and Bandy were also with them.

19     26.    The threat to DF, introduced in the March 5, 2014, call, was further explained

20 in a March 13, 2014, intercepted call between Graves and co-defendant Brenda Rodriguez.

21 Graves said:

22     I swear to God, you can ask that [person] Trey-O [Cook] what I told em, I said
       [person] we'll have to do [kill] the bitch [DF] . . . the bitch [DF] probably told
23     them [law enforcement authorities] the whole plot [what happened the night
24     of Hill's murder] . . . if it was my call to make, I'd snatch that bitch [DF] and
       have that bitch [DF] tied up some mother fucking where . . . next time you all
25     see this bitch [DF], it'll be in a body bag.
26

27                                          9                              *14-CR-1288-DMS*

28

27.    Graves provided specific details that identified DF as the target, and concluded that because DF was probably in protective custody and out of reach, they needed to go after DF's family.  In particular, Graves stated:

> (U/I) fuck how big the family is and what they going to do, . . . we gonna knock [kill] as many of you mother fuckers off until that time comes . . . we lose 2-3 homies, 2-3 mother fuckers in your family got to go . . . you run your mouth, you die, period . . . .

28.    Upon hearing this call, myself and other investigators believed the WCC was planning the murder of DF and her family.  Further, because Hollins was then detained in the George Bailey Detention Center (GBDF), I believed the topic of DF and her family was likely the subject of discussion by Hollins and other WCC members detained in that jail.  I know DF was close to Hollins and it would be unlikely for the WCC to act on DF without some input from Hollins. Law enforcement located and warned DF. DF was ultimately not harmed.

29.    Thus, by mid-March 2014, I was aware the WCC had killed Paris Hill because of his cooperation with law enforcement and was actively planning the murder of DF. Moreover, I and the other investigators involved in the case had reason to believe the plot to murder Paris Hill and, to a certain extent, the conspiracy to murder DF had originated through discussions by WCC members who were then detained within the GBDF. Throughout this time, I had regular discussions with local law enforcement officers who were conducting a parallel investigation.

30.    On March 18, 2014, at the request of detectives with the San Diego Police Department, San Diego Sheriff's Deputies installed a recording device in a jail cell occupied by WCC members Hollins, Marcus Foreman, and Darnell Butler.

31.    The recording device installed in their shared cell on March 18, 2014, ran for approximately 72 hours.   Over the course of the recording, Hollins made several statements.[5]  These statements include:

i.    **Excerpt No. 1**

| | |
|---|---|
| Foreman: | So where was he [Paris Hill][6] laying anyway? |
| Hollins: | You know, where you come out the gate? |
| Foreman: | The front gate or the back gate? |
| Hollins: | The back gate, probably about ten or fifteen feet. |
| Foreman: | To the left or right? |
| Hollins: | To the right. |
| Foreman: | Oh, so the way to the street? |
| Hollins: | Nah man, going down towards the mother fucking police station. |
| Foreman: | Oh out front gate?  Oh, I thought the front gate was the one on the sidewalk. |
| Hollins: | Yeah. |
| Foreman: | The back gate (U/I) the trail. |
| Hollins: | Ok well yeah . . . . like ten feet. |
| Foreman: | Oh so whoever was parked down that way couldn't see regardless . . . so whoever was parked up to (U/I). . . . . |
| Hollins: | Not when you walk down. . . . We were on the sidewalk walking down. . . . |
| Foreman: | Did anybody make a scene? Like, nobody? No bitches? No nothing? |
| Hollins: | It's West Coast . . . it's political. . . . |
| Butler: | On the set . . . |
| Foreman: | It's Southeast! |
| Hollins: | That shit showed me homie. |

---

[5]    The quoted excerpts are based on my best effort to describe what I heard on the recording, which is at times difficult to decipher due to background noise.

[6]    Given the context of the conversations, I believe Hollins, Butler, and Foreman discussed the events surrounding the murder of Paris Hill.

11

| | |
|---|---|
| Foreman: | If a [person] go through channels, you get your ass knocked down (laughing loudly) . . . |
| Hollins: | If you go through the proper steps . . . |
| Foreman: | You get your ass knocked down. |
| Unknown: | It's vicious . . . |
| Hollins: | (U/I) 911 . . . no running . . . we came back . . . dancing. |

32.     This excerpt describes the exact location of Paris Hill's murder. Paris Hill's body was found a short distance from the rear gate of the Common Grounds night club. There is an SDPD office a short distance away, in the same direction. I believe Foreman's comment that if a person goes "through channels, you get your ass knocked down" and Hollin's echoing, "if you go through the proper steps" is a reference to seeking, and receiving, approval to murder Paris Hill.

**ii.     Excerpt No. 2**

| | |
|---|---|
| Hollins: | You know me, I know the political stand point. I went back to Sweets [Graves], let me holla at you . . . Sweets [Graves] is looking at me like this, you know what I mean. |
| Foreman: | You already talked about it. Stop talking. Get to it. |
| Hollins: | Nah, not stop talking but he was just like . . . . |
| Foreman: | It's blue [referring to Crip authorization to kill a person] it's blue little homie. |
| Hollins: | It's (U/I) possible to hit him right now. You know what I mean. And like Sweets [Graves] and Crazy Mike [not yet identified] was standing right here, right.  And we walked in, Crazy Mike just looked at me and looking at me like . . . . |
| Foreman: | With that grin? |
| Hollins: | Crip cuz. Look, I felt good, I was like, you know what I mean [person].  Because I've been getting a different response from Mike and them, Kee, like, ever since that like G-homies [senior gang members] that been knowing are always be cracking (U/I) but when that happened I've been getting nods, like, from the [persons] that I want to get the nods from. |

12

*14-CR-1288-DMS*

33.     I believe this excerpt is a specific reference by Hollins to receiving Grave's approval to murder Paris Hill. I know for a Crip the color blue has symbolic significance. When Hollins describes Grave's approval to Foreman as "looking at me like this, you know what I mean" Foreman begins to answer, "it's blue little homie," which signifies Grave's approval. A "blue light" for a Crip gang member is an authorization to kill a person, borrowing from the phrase "green light" used within the  Mexican Mafia. Hollins corroborates this interpretation when he responds to Foreman's interpretation of Grave's nod of approval: "It's possible to hit him right now you know what I mean." Based on this exchange, I believe Grave's specifically approved Hollin's decision to murder Paris Hill immediately prior to the murder.

### iii.     Excerpt No. 3

| | |
|---|---|
| Hollins: | (U/I) cooperation, homie . . . this ain't that heartless. |
| Butler: | He's a homie, [person].  He just didn't know what you was doing and he fucks it up. Point blank period. He fucked up. |
| Foreman: | He knew what he was doing . . . . |
| Hollins: | When it was time it's still being like, I seen it all in his face . . . That little [person] is gangsta though. He knew that . . . it was his doing to do that to him. The whole time, you could just see it looked like he was (U/I) crying. |
| Butler: | Like (U/I). |
| Hollins: | On Crip [person]. |
| Butler: | I am my brother's keeper. You think you can run, G. |
| Hollins: | I didn't want to look at him. You know what I mean. (U/I) I did it though. Cuz was looking at me like . . . when we left that gate, and went down that hill a little bit and we got to talking a little bit, he was standing there just looking at me. . . . Love him you know, still love him till today. Still love him. Still my [person]. Still gonna look out for your kids[7] . . . all that. On Threes [the |

---

7     In March 2014, Hill was a father.

13

*14-CR-1288-DMS*

3-Babiez clique], I got him. Still . . . like come on Kee, but you fucked up homie. You fucked up . . . like you was wrong!

34.    I believe that in this excerpt Hollins justifies his murder of a fellow gang member by reference to the WCC unyielding rule that cooperators must be killed. Hollin's states the murder was not heartless, it was required by the WCC code to not tolerate any cooperation with law enforcement. Butler echoes that sentiment: "[p]oint blank period, he fucked up." And Foreman finishes the thought, "[h]e knew what he was doing." I believe Hollins, Foreman, and Butler were each reciting a code revered by WCC leaders, such as Graves, who not only recite the code generally but, in this case, specifically counselled and directed Hollins to apply it to Paris Hill. I further believe in the moments prior to Paris Hill's murder Graves provided the approval necessary for Hollins, Cook, and Bandy to carry out the murder without fear of reprisal from other WCC members.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: July 14, 2022

KATIE HARDING
Supervisory Special Agent, FBI

14

*14-CR-1288-DMS*